## IOWA STATE COLLEGE RESEARCH FOUNDATION v. TOLIBIA CHEESE CORPORATION.

Civ. A. No. 588.

District Court, E. D. Wisconsin.

Jan. 20, 1943.

Bair & Freeman, of Chicago, Ill. (W. P. Baer and C. W. Ooms, both of Chicago, Ill., and Benjamin T. Schiek, of Milwaukee, Wis., of counsel), for plaintiff.

Nathan Pereles, Jr., of Milwaukee, Wis. (Samuel F. Frank, of New York City, of counsel), for defendant.

DUFFY, District Judge.

This is a patent infringement suit involving Claims 2 and 3 of Lane and Hammer Patent No. 2,132,077, for Method of Making Blue-Veined Cheese. The application was filed November 14, 1936, and the patent was issued on October 4, 1938.

The claims involved are:

"2. A method of making blue-veined cheese which involves the separation of whole milk intended for cheesemaking into skim milk and cream; treating the cream with a homogenizing process by which the fat globules are broken up into smaller units than they exist in normal cream and then recombining the skim milk and cream after which the mixture is made into blue-veined cheese.

"3. A method of making blue-veined cheese which involves the homogenization of the milk fat intended for cheese making at a temperature below 110° F. to prevent the destruction and inhibition of the activity of inherent milk lipases, and at a pressure of 1000 to 4000 pounds per square inch to materially break up the fat globules after which the milk fat is made into blue-veined cheese."

Blue-veined cheese (sometimes called "blue cheese") gets its name from the characteristic blue streaks in the cheese which is imparted by mold growth. This mold is put into the cheese during the process of manufacture. The scientific name of the mold is "Penicillium Roqueforti". The most famous of blue-veined cheeses comes from Roquefort, France, and is made from sheep's milk, and is cured in caves.

It was generally recognized that it would be very desirable if blue-veined cheese could be produced in this country from cow's milk. The United States Department of Agriculture commenced experiments as early as 1918. The process which was developed was not satisfactory. The greatest difficulty was the failure to obtain uniform results; there was great uncertainty and instability in the process. Apparently no one ever adopted or used the government method commercially. The record in this case shows that in addition to the United States Department of Agriculture, the Quebec Department of Agriculture, the University of Minnesota, the Iowa State College at Ames, the Kraft Cheese Company, and Mr. Frederiksen, all of whom were skilled in the art and had access to the literature, had been working at various times in the period from 1918 to 1935 in an endeavor to make blue-veined cheese. None of the methods employed involved homogenization. None of the products were uniform. Frederiksen, who formerly had been employed in the Kraft effort, had perhaps the best success of any during that period, but his product likewise was not uniform and his cheese took seven or eight months to cure. He could not be sure what kind of cheese he had until the curing process was complete. This involved tying up considerable capital. Altogether his method was very unsatisfactory.

At the Iowa State College a determined effort was made to develop blue-veined cheese. It tried its own method for years, but the quality was not uniform and color difficulties were encountered. A Dane who was familiar with the methods used in Denmark was employed to produce cheese ac-

414

cording to the Danish method, but after two or three years this proved to be un-successful. An attempt was also there made to use the method suggested as the result of the federal government's experiments, but this effort was likewise unsuccessful. Those who thus experimented reported that it was impossible to get a uniform product, and no one seemed to know just why such a result obtained.

After the Dairy Department at Iowa State College had been unsuccessful in its efforts, it turned the problem over to the Research Department where Dr. Hammer and Dr. Lane began work on it sometime in the latter part of 1931 or the early part of 1932. Their own research as well as the literature disclosed that the fats forming part of the whole milk have certain kind of enzymes called "lipases" or "lypalytic enzymes". These enzymes have the capacity to hydrolize or break down the fats to glycerol · and fatty acids. This breakdown of fats and the formation of acids occurs in the making of blue-veined cheese and contributes to its flavor. It was also well known that the fat globules in cow's milk are larger than those in sheep's milk.

Hammer and Lane decided to homogenize the milk to be made into blue-veined cheese. A homogenizer is a machine consisting essentially of a steel plate containing apertures through which milk or cream is forced under pressure so that the butter fat globules are broken up into smaller particles. Such machines were in use in the United States as early as the year 1928, and were well known in the trade prior to the Lane and Hammer experiments.

It was well known in the art that when the fat globules were reduced to smaller particles they had a greater total surface area. Hammer and Lane decided to bring about this result by using the homogenizer. The resultant product before curing was rancid. Hammer and Lane discovered, however, that when the mold was introduced, the mold lipases began their work, and that they were greatly aided by the reduced size of the homogenized fat particles. This not only speeded up the curing of the cheese, but produced a uniform product.

The validity of the patent in suit must be determined by the answer to the question, Was the use of the homogenizer in the light of the knowledge then available an invention, or was it a conclusion that

one skilled in the art would naturally reach in solving the problem of producing a satisfactory blue-veined cheese?

There was no invention in separating the cream from the balance of the milk and running the cream through the homogenizer rather than the milk in its natural state. That would be merely a matter of mechanics, and a saving of time, for perhaps ten times as much cream as whole milk could be run through a homogenizer of a given size in a given period.

The book, "Fundamentals of Dairy Science", by Rogers, has been referred to as the cheesemakers' "Bible". It is not disputed that it is considered an authority among cheesemakers. In the 1935 Edition, he writes (p. 241):

"Homogenized milk is now frequently used in the manufacture of Neufchatel and Cream cheese, and is said to be beneficial in producing a soft, smooth texture and reducing the fat loss in the whey; in the case of other varieties like Brick, Limburger and Swiss, this treatment of the milk has given unsatisfactory results. * * *

"* * * Sammis found that curds from homogenized milk were fragile and easily broken with curd knives. Limburger and Brick cheese cracked and had a bad flavor when made from homogenized milk. Swiss cheese made from homogenized milk had a bad flavor and was entirely lacking in eyes. It is said that in some cases homogenization seems to produce bitterness and rancidity in Neufchatel and Cream cheese."

It is fair to say that the statements quoted from Rogers represent the general viewpoint of the trade in the year 1935. It is true, nevertheless, that in 1917 the Dairy School of Quebec suggested the use of homogenized cream in cheese. The report made by that school does not state what kind of cheese was attempted, but does say that there was produced "a sound and very acceptable product, although inferior in quality to that obtained when using raw milk of good quality." It is a fair conclusion that it was the experience of the industry up to 1935 that homogenization might be beneficial in making Neufchatel and Cream cheese, which were soft, uncured cheeses, because it gave them a finer texture and reduced fat losses in the whey, and that, on the other hand, homogenization was undesirable in making cured cheeses. Rogers also noted that the rancidity which usually resulted might be due

to the increased fat decomposition due to lipases activity where the fat particles had been reduced in size. No one, however, seemed to know how to control the process so as to prevent the development of rancidity.

Lane and Hammer did discover why one could homogenize the fats in milk used in making blue-veined cheese without having rancidity in the final product. Before the cheese was cured, rancidity was present; but they found that the mold which is used in making blue-veined cheese had its own lipases which contributed to the breakdown of the fats of the milk, and that action by the mold lipases was greatly facilitated when the cream had been homogenized. They discovered that the mold lipases worked faster and better on homogenized fats than on fats which had not been homogenized. The mold lipases used up or consumed the fatty acids, which caused rancidity, and brought about a change which not only did away with the rancid taste and smell, but produced instead the desired peppery flavor. This result was not known to the art before Lane and Hammer.

In addition, this discovery brought stability and certainty into the art of making blue-veined cheese. Lane and Hammer discovered that homogenization could be used in a way that the product would be uniform, the color good, and the time of curing relatively short. I am of the opinion that this discovery constituted invention. Even though the process of homogenization was known in the art, a new and important result was obtained. The step of homogenization changed failure to success. It was contrary to the teaching of the art.

Defendant refers to Stevenson Patent No. 1,868,547, July 26, 1932, to demonstrate that homogenization was not new in cheesemaking. It is true that Stevenson does suggest the use of homogenization in the making of cheese. He was referring to Cheddar cheese, and the distinction should be kept in mind that mold which is used in the curing of blue-veined cheese would be objectionable in the making of other kinds of cured cheeses. Stevenson's teaching that the product should be kept in an inert gas to prevent the growth of mold shows that his teaching was away from the use of homogenization in a cheese where the development of mold was desirable.

The commercial success which attended the discovery by Lane and Hammer is persuasive evidence that the patent is efficient and serviceable. Thirteen manufacturers have taken licenses from the plaintiff, and have paid royalties in excess of $15,000 on millions of pounds of cheese. The defendant strongly urges that the development of the American blue-veined cheese is due to the war which has shut off the importation of cheaper Danish or French blue-veined cheese. Undoubtedly the war has had some influence, but it does not explain why the American manufacturers who have taken licenses should choose to follow the Lane and Hammer method and pay royalties under the patent in preference to using the discarded federal or the Danish methods where no royalties would be required. I am of the opinion that Claim 2 is valid, and that the defendant has infringed.

I shall make but brief reference to Claim 3. I do not consider that this claim is valid. The idea which is the basis of that claim is that the inherent milk lipases should not be destroyed because they would assist in the work performed by the mold lipases. However, the limitation of operating the homogenizer below a certain temperature would be but a natural step to be taken by anyone skilled in the art. The pressure range of 1000 to 4000 pounds per square inch set forth therein was the entire efficient operating pressure range of the homogenizer. There was no invention involved in such limitation of temperature or pressure. Furthermore, it is quite clear that the defendant did not infringe this claim. On all but rare occasions he ran the homogenized cream and the skim milk through a pasteurizer where the temperature would be much in excess of the limit stated. In fact it was the purpose of the defendant to destroy inherent milk lipases as well as certain germs that milk contains.

To summarize: I conclude that Claim 2 is valid and infringed, and that Claim 3 is invalid, but in any event is not infringed.